**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

FILED

Aug 18 2014, 9:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**THOMAS G. KROCHTA**
Vanderburgh County Public Defender
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: J.E., Minor Child, | ) ) ) | |
| | ) | |
| JY.E., Father, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1401-JT-20 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
The Honorable Renée Allen Ferguson, Magistrate
Cause No. 82D01-1307-JT-74

**August 18, 2014**

**BROWN, Judge**

JY.E. ("Father") appeals the involuntary termination of his parental rights to his son, J.E. Father raises one issue which we revise and restate as whether the evidence was sufficient to support the termination of his parental rights. We affirm.

FACTS AND PROCEDURAL HISTORY

Father and S.M. ("Mother") had two children, J.E., born on December 13, 2009, and K.E.[1] Shortly after J.E. was born, Father began using methamphetamine. On March 22, 2012, the Vanderburgh County Sheriff went to the address of J.E.'s grandparents to serve a search warrant, found drug activity in the home, and requested the presence of the Department of Child Services ("DCS").[2] Father and Mother were at the residence and refused drug screens, and while the family case manager was attempting to interview Mother and gather information, Father yelled from outside of the home encouraging Mother not to cooperate. According to the Intake Officer's Report of Preliminary Inquiry and Investigation, "[i]n the home in very easy accessibility to the child were various pills in unmarked bottles, coffee filters with a white powder residue in them, pipes that had been used to smoke methamphetamine, multiple grinders, and what appeared to be finished product of methamphetamine." DCS Exhibit 3 at 6. Father was later charged and

---

[1] Mother's parental rights to J.E. were terminated by default judgment on October 28, 2013. This case does not involve Father's parental rights to K.E.

[2] The Verified Petition Alleging Child in Need of Services alleged that the grandparents involved in the manufacturing of methamphetamine were J.E.'s paternal grandparents, and the Intake Officer's Report of Preliminary Inquiry and Investigation states that the paternal grandparents, M.C. and K.C., were involved. Father testified that K.C. was his stepfather.

convicted of dealing in methamphetamine as a class B felony, neglect of a dependent as a class C felony, and maintaining a common nuisance as a class D felony. The court sentenced Father to an aggregate sentence of ten years executed.

On March 26, 2012, DCS filed a verified petition alleging that J.E. was a child in need of services ("CHINS"). The petition alleged that J.E.'s physical and mental condition were seriously endangered as a result of the refusal, inability, or neglect of his parents to supply him with necessary supervision, shelter, and medical care. DCS placed J.E. with his maternal great-grandmother.

On March 29, 2012, the court entered an Order on Initial/Detention Hearing and found that it was in J.E.'s best interests to be removed from the home and that "reasonable efforts to prevent or eliminate removal of the child were not required due to the emergency nature of the situation, as follows: Evidence of a methamphetamine laboratory was found in the child's residence, and both parents are currently incarcerated." DCS Exhibit 2 at 4.

When DCS became involved, J.E.'s teeth were extremely bad and he had to have several teeth pulled and some root canals. The dentist reported that the condition of J.E.'s teeth "had a lot to do with just lack of cleaning his teeth. Lots of sugar, lots of juice, stuff like that. And lack of just regular checkups and cleanings." Transcript at 45. Within a couple of months of being involved with DCS, J.E. began speech therapy because he had trouble speaking and understanding what was being said to him.

In June 2013, speech therapy was stopped because J.E. had improved and no longer needed therapy. That same month, J.E. was placed with Father's sister, H.D. H.D. had

3

custody of K.E. and had requested that J.E. be placed with her so the children could be together.

On July 2, 2013, DCS filed a verified petition to terminate Father's parental rights to J.E. At some point, DCS asked for an order to allow J.E. to visit Father in prison because H.D. indicated that, even with an adoption, Father would still be in H.D.'s life following release, and Hilary Bemis, the family case manager ("FCM"), thought it was appropriate to make sure the interaction was appropriate prior to finalizing the adoption and closing the case. On July 9, 2013, the court entered an order allowing visitation between J.E. and Father.

On October 28, 2013, the court held an evidentiary hearing. Father testified that he was twenty-six years old, had been incarcerated for twenty-one months, and that J.E. comes to see him every other weekend. When asked why he was incarcerated, he stated that he "got in trouble at [his] Mother's house" and that he was not aware there was methamphetamine material in the home. Id. at 17. He admitted that he used methamphetamine in the past and had "two possessions of methamphetamine" and that he was arrested for possession of paraphernalia five days before the arrest resulting in the dealing in methamphetamine charge. Id. at 18. When asked why he believed his criminal activity would stop, Father testified: "I can't do it no more and I definitely don't want my kids going through it." Id. at 20.

When asked whether he had done anything while he had been in prison to try and improve his parenting skills, Father stated that he completed "24/7 Dads" and was enrolled in "intensive Inside/Outside Dads and Healthy Family Relationships." Id. at 20-21. Father

4

testified that he was not sure whether J.E. had health insurance when J.E. was with him and was not sure if J.E. had visited a dentist. He also testified that he had five felonies and believed he would be released in 2015 with time cuts. On cross-examination, Father admitted that he had not had any kind of substance abuse counseling, but had applied about two or three weeks earlier for outpatient substance abuse. On redirect examination, Father testified that his counselor informed him that he had to graduate the Plus Program before he could start substance abuse counseling.

Father's records from the Branchville Correctional Facility indicate that there were no detainers, pending charges, or conduct violations for the period through September 4, 2013. Father participated in the Purposeful Living Units Serve program, was doing well in that program, and could receive a 183-day time reduction for the successful completion of the program in December 2013. Father also "started/completed" "The Spiritual Literacy Project: Reading the Sacred in Everyday Life," "Developing a Winning Attitude," "Please Understand Me," "Financial Planning," "Safe People," "The Seven Habits of Highly Effective People," "Commitment to Change," "Responsible Parenting," and "Houses of Healing." Father's Exhibit B at 2.

The FCM testified that she believed termination of Father's parental rights was in J.E.'s best interests. She also testified that H.D. was in favor of a termination of Father's parental rights rather than a mere guardianship because H.D. was concerned that Father could still gain custody of the children. Bree Johnson, the court appointed special advocate ("CASA"), testified that she believed that termination of Father's parental rights was in J.E.'s best interests.

5

On December 17, 2013, the court terminated Father's parental rights to J.E. The court's order states in part:

## FINDINGS OF FACT

\* \* \* \* \*

5.      On May 1, 2012, a dispositional hearing concerning [J.E.] was held. [Father] appeared in court, in custody and with counsel, and signed a parental participation agreement. The court issued a dispositional order and ordered [Father] to comply with the parental participation plan. (DCS Exhibit 1: Certified CHINS Docket of [J.E.]).

6.      Although DCS formed a Pre-Dispositional Report and Plan for Parental Participation to reunify child with his parents, [Father] did not engage in any services offered by DCS due to his incarceration. At the time of the Dispositional Hearing [Father] was child's alleged father and he was ordered by the Court to establish paternity over the child. (DCS Exhibit 2: Certified CHINS Orders for [J.E.]; DCS Exhibit 3: Certified CHINS File of [J.E.]).

\* \* \* \* \*

9.      Father has demonstrated he is a habitual criminal offender through his lengthy history of arrest and incarceration. Father is twenty-three (23) years old.[3] Father admitted he has been found guilty of five felonies over the course of his adult life, beginning when he was nineteen (19) years old. (DCS Exhibits 7-9; Testimony of [Father]).

10.     Father was most recently arrested on March 27, 2012, when a methamphetamine lab was discovered in the home where he, mother, and child were living. Father was arrested and charged with three felonies as a result: Dealing in Methamphetamine, Neglect of a Dependent, and Maintaining a Common Nuisance. Father was found guilty of all three counts by a trial by jury on August 4, 2012. On October 11, 2012, [Father] was sentenced to execute ten (10) years, four (4) years, and eighteen (18) months respectively on the charges. At the present time [Father] is concurrently serving these sentences at the Branchville Correctional Facility. (DCS Exhibit 7; Testimony of [Father]).

---

[3] Father testified that he was twenty-six years old.

11. At the time of trial, [J.E.] had been removed from the parents and placed in relative care for over nineteen (19) months, during all of which time [Father] had remained incarcerated and was unable to provide for or care for [J.E.]. FCM, Hilary Bemis, testified [Father] had not been able to see or visit with child until about six (6) months prior to the termination trial. (DCS Exhibit 7; Testimony of [Father] and FCM, Hilary Bemis).

12. Father has no income, no employment, no place of residence suitable for caring for child, nor even a definite release date. The most [Father] could provide was if he continues to obtain credit for his classes and behavior, he could be released early. Father hopes to live with [J.E.'s] paternal grandfather when he is released. (Testimony of [Father]).

13. Father has never been the child's sole caretaker, but relied on [J.E.'s] mother to care for child when she wasn't incarcerated. Father could not state where or how often the child went to the doctor or dentist when last in his and [Mother's] care; [Father] did not know if [J.E.] was ever covered by insurance or Medicaid. (Testimony of [Father]).

14. When [J.E.] was removed from [Father's] home he was two (2) years old. [J.E.] was not current on his vaccinations or appointments with his physician. [J.E.] was also not current on his dentist appointments and needed cavities filled and caps on his teeth, which he received after becoming a ward of the state. (DCS Exhibit 3; Testimony of FCM, Hilary Bemis).

15. Father has a history of drug and alcohol use. At nineteen (19) years old [Father] was convicted of burglary for stealing alcohol upon breaking into a country club pool in Mount Vernon, Indiana. Father pled guilty to Possession of Marijuana on September 26, 2009, and was sentenced to a one-year suspended incarceration. Father stated he began using methamphetamine when he was twenty-three (23) years old. Father refused a drug screen when requested at the time CPS removed the child due to methamphetamine in [Father's] home. Father testified he has never participated in a substance abuse evaluation. [(]Testimony of [Father]; DCS Exhibits 7-9).

16. [J.E.] is placed in relative care with the paternal aunt. Father admitted [J.E.] is in a safe and loving home with the paternal aunt and [Father] would like for [J.E.] to remain in this home. (Testimony of [Father]).

7

17. [J.E.] has a later born sibling of the same mother and father which [sic] has also been removed from the parents. [J.E.'s] sibling has been placed in the same home with child; child and sibling are bonded. (Testimony of FCM Hilary Bemis; Testimony of Breanna Johnson, CASA).

18. FCM, Hilary Bemis, has been the ongoing case manager for [J.E.'s] case since October of 2012. Ms. Bemis testified [J.E.] is very happy in relative placement's home and is bonded with his sibling and placement. FCM Bemis testified that [J.E.] demonstrated several problems with his speech when she became involved which required speech therapy. Since therapy engagement, [J.E.'s] speech has improved so much so that he is no longer eligible therapy [sic]. FCM also testified that [J.E.] had very poor teeth at the initiation of his CHINS case which has also been remedied with regular visits to the dentists. (Testimony of FCM, Hilary Bemis).

19. CASA, Breanna Johnson, has observed [J.E.] interact with his sibling and placement in the placement's home. The home is safe, appropriate, and a loving and caring environment that meets child's needs. Ms. Johnson has witnessed a bond between [J.E.] and his sibling, as well as a bond between [J.E.] and his relative placement. The relative placement is pre-adoptive and has indicated she would like to adopt [J.E.] so he may have a safe and stable home. (Testimony of Breanna Johnson).

20. Ms. Bemis and Ms. Johnson recommend termination of [Father's] parental rights regarding [J.E.] as in the best interests of the child. (Testimony of FCM, Hilary Bemis and testimony of Breanna Johnson).

Conclusions of Law

* * * * *

5. The Court now finds by clear and convincing evidence that the allegations of the petition to terminate parental rights are true in that:

   a. [J.E.] has been removed from the care and custody of [Father] for at least fifteen (15) of the most recent twenty-two months (22).

   b. There is a reasonable probability that the conditions that resulted in the removal of [J.E.] having continued

8

placement outside the care and custody of [J.E.] will not be remedied.

c. There is reasonable probability that the continuation of the parent-child relationship between [Father] and [J.E.] poses a threat to the well-being of [J.E.].

d. Termination of the parent-child relationship between [J.E.] and [Father] is in [J.E.'s] best interests.

e. The plan of the Department of Child Services for the care and treatment of [J.E.] upon termination of parental rights is adoption, which is acceptable and satisfactory.

Appellant's Appendix at 20-23.

DISCUSSION

The issue is whether the evidence is sufficient to support the trial court's judgment terminating Father's parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161, 122 S. Ct.

9

1197 (2002); see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

    (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

10

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g denied. "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

Father argues that neither the trial court's findings of fact nor the evidence sufficiently provide clear and convincing evidence that the conditions that resulted in J.E.'s removal will not be remedied, that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of J.E., or that termination of parental rights is in J.E.'s best interests. Father argues that his testimony and correctional records demonstrate that he deserves an opportunity to show he can do better. He points to his successful completion of programs and asserts that an opportunity to show that he could do better would present little or no potential harm to J.E., because his current placement is with Father's sister who intends to adopt the child and allow Father to have a relationship with him. He contends that he has not been provided services because he has been incarcerated.

The State argues that the court's unchallenged findings regarding Father's criminal history and lack of involvement with J.E. support the court's conclusions and ultimate judgment. The State asserts that although Father participated in some prison services, he has not participated in any services to address his addiction to methamphetamine. The

11

State also points out that Father's sister testified that she was not willing to have mere guardianship over J.E. because she did not consider guardianship stable enough for J.E.

Father challenges the sufficiency of the evidence supporting the trial court's judgment with regard to Ind. Code §§ 31-35-2-4(b)(2)(B) and (C) set forth above. Initially, we note that Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive. Thus, although the trial court found that clear and convincing evidence supported DCS's claims that there is a reasonable probability the conditions resulting in J.E.'s removal and continued placement outside Father's care will not be remedied *and* that continuation of the parent-child relationship poses a threat to J.E.'s well-being, it was required to find only that one of the requirements of subsection (B) had been met in order to properly terminate Father's parental rights. See L.S., 717 N.E.2d at 209.

We begin our review by determining whether clear and convincing evidence supports the trial court's findings regarding Father's ability to remedy the conditions that resulted in J.E.'s removal and continued placement outside of his care. When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. Additionally, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support,

and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. We have previously explained that DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

We acknowledge Father's efforts while in prison, but observe that Father began using methamphetamine shortly after J.E. was born and that Father had not had any kind of substance abuse counseling at the time of the termination hearing. Further, the record supports the court's finding that Father was an habitual criminal offender. The record reveals that Father's criminal history includes offenses occurring both before and after J.E.'s birth. In 2006, the State charged Father with burglary as a class C felony and theft as a class D felony, and Father later pled guilty to burglary as a class C felony. In 2009, Father pled guilty to carrying a handgun without a license as a class A misdemeanor. In 2012, Father was convicted of dealing in methamphetamine as a class B felony, neglect of a dependent as a class C felony, and maintaining a common nuisance as a class D felony. In October 2012, the court sentenced Father to ten years incarceration. Even assuming that Father's testimony that he could be released in 2015 with time cuts is correct, such a release was still more than one year away from the date of the termination hearing. We conclude that the trial court's findings, as well as its ultimate determination that there is a reasonable probability the conditions resulting in J.E.'s removal and continued placement outside of Father's care will not be remedied, are supported by clear and convincing evidence.[4]

---

[4] Having determined that the trial court's conclusion regarding Father's future inability to remedy

13

We next turn our attention to Father's allegation that DCS failed to provide sufficient evidence to establish that termination of his parental rights is in J.E.'s best interest. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. A.D.S. v. Ind. Dep't of Child Servs., 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), trans. denied.

The FCM testified that she believed termination of Father's parental rights was in J.E.'s best interests. When asked for the basis of her opinion, the FCM testified:

> For the Father it was based on the fact that he's been incarcerated throughout the case and that his out date is not until 2017. And just the fact that he has such a criminal history, it doesn't appear that maintaining stable sole custody or just being a sole care giver of the child would be appropriate.

Transcript at 50. The FCM also expressed concern about further drug use by Father because "that's been a problem in the past." Id. The CASA testified that she believed that termination of Father's parental rights was in J.E.'s best interests. When asked why she felt that way, the CASA answered:

---

the conditions resulting in J.E.'s removal from his care is supported by clear and convincing evidence, we need not also determine whether the trial court's conclusion that continuation of the parent-child relationship poses a threat to J.E.'s well-being is likewise supported by sufficient evidence. See L.S., 717 N.E.2d at 209 (explaining that Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive).

I feel that way because of his past criminal records and the drug use. Also because my concerns for it are whenever he does get released it sounds like his friends and the people he hangs around with is more of a safety concern. Most of his felonies have been you know, things that have found because of his friends. And I'm just . . . it's a safety concern.

Id. at 55. The CASA also testified that adoption offered more stability than guardianship and that J.E. deserved some stability for the rest of his life.

In light of our deferential standard of review and based on the totality of the evidence coupled with the testimony from both the FCM and CASA recommending termination of Father's parental rights, we conclude that there is ample evidence to support the trial court's conclusion that termination of Father's parental rights is in J.E.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

## CONCLUSION

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

BARNES, J., and BRADFORD, J., concur.